**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

**THE CITY OF STARKVILLE, MISSISSIPPI** — **PLAINTIFF**

**V.** — **NO. 1:24-CV-15-DMB-DAS**

**J & P CONSTRUCTION CO., INC.; EVOQUA WATER TECHNOLOGIES LLC; VOLKERT, INC.; and ENVIRONMENTAL TECHNICAL SALES, INC.** — **DEFENDANTS**

# OPINION AND ORDER

The City of Starkville moves to exclude the opinions of Evoqua Water Technologies LLC's expert witnesses Susan Paulsen and AJ Schrauth. Because two of Paulsen's opinions are unnecessary and/or irrelevant but Paulsen's opinions and Schrauth's opinions are otherwise relevant and reliable, the motion to exclude Paulsen's opinions will be granted in part and denied in part, and the motion to exclude Schrauth's opinions will be denied.

## I
## Relevant Procedural History

On December 22, 2023, the City of Starkville, Mississippi, filed a complaint in the Circuit Court of Oktibbeha County, Mississippi, against J & P Construction Co., Inc.; Evoqua Water Technologies LLC; Volkert, Inc.; and Environmental Technical Sales, Inc., regarding a project designed by Volkert and constructed by J & P to address the aeration of wastewater in the City's oxidation ditches at the Ernest E. Jones Wastewater Treatment Plant using disc aerators supplied by Evoqua. Doc. #5. Evoqua removed the case to the United States District Court for the Northern District of Mississippi on January 24, 2024, which the other defendants joined. Docs. #1, #2, #3, #4. The City's governing second amended complaint filed on November 8, 2024, contains seven

counts: (1) breach of contract by Volkert and J & P (Count One); (2) negligence by J & P (Count Two); (3) negligence by Volkert (Count Three); (4) negligence by Evoqua (Count Four); (5) breach of express warranty by Evoqua (Count Five); (6) breach of implied warranty of merchantability by Evoqua (Count Six); and (7) breach of implied warranty of fitness for a particular purpose by Evoqua (Count Seven). Doc. #98 at 6–11. Environmental Technical Sales was terminated as a party on June 9, 2025, Doc. #172; and J & P and Volkert were dismissed pursuant to a stipulation of dismissal filed March 16, 2026, Doc. #249, leaving Evoqua as the sole remaining defendant. On June 2, 2025, the Court granted Evoqua's motion to dismiss as to the City's implied warranty claims.[1] Doc. #167. Evoqua answered the second amendment complaint on June 16, 2025. Doc. #176.

On December 12, 2025, pursuant to Federal Rule of Evidence 702, the City filed a "Motion to Exclude Testimony of [Evoqua's] Expert Witness, Susan Paulsen," Doc. #224; and a "Motion to Exclude Testimony of [Evoqua's] Expert Witness, Dr. AJ Schrauth," Doc. #230. On January 9, 2026, Evoqua responded in opposition to both motions.[2] Docs. #238, #239.[3] The City replied to both of Evoqua's responses on January 16, 2026. Docs. #246, 247.

## II
## Federal Rule of Evidence 702

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony, providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent

[1] At that time, this case was assigned to United States Senior District Judge Sharion Aycock, as it had been since it was removed from state court.

[2] The Court granted Evoqua's request for an extension to respond. Doc. #235 (text only order). In violation of Local Rule 7(b)(2), Evoqua did not file separate memorandum briefs in support of its responses. In the interest of considering the motions to exclude on their merits, the Court excuses these procedural deficiencies in this instance.

[3] On January 14, 2026, Judge Aycock recused from this case, and this case was reassigned to the undersigned district judge. Doc. #242.

> demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

When "an expert's testimony, or its 'factual basis, data, principles, methods, or their application,' [is] 'called sufficiently into question,'" the Court must conduct an inquiry pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001)). Under *Daubert*, district courts hold a "gate-keeping role" in which they are tasked with "determining whether expert testimony under Rule 702 is 'not only relevant, but reliable.'" *Hathaway v. Bazany*, 507 F.3d 312, 317 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 589). "The reliability prong mandates that expert opinion 'be grounded in methods and procedures of science and … be more than unsupported speculation or subjective belief.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (per curiam) (quoting *v. Curtis v M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)). "The relevance prong requires the proponent to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *Id.* (quoting *Curtis*, 174 F.3d at 668).

The party offering the expert "need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). Trial courts are afforded "'broad discretion in deciding' whether to admit expert testimony." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018) (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)).

> However, in determining the admissibility of expert testimony, the district court should approach its task "with proper deference to the jury's role as the arbiter of

> disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."

*United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

## III
## Relevant Factual Allegations

The City of Starkville implemented a project to improve its Ernest E. Jones Wastewater Treatment Facility ("WWTP"). Doc. #98 at 2–3. As a part of the project, the City contracted Volkert, Inc., to develop plans and specifications to upgrade two of the facility's oxidation ditches. *Id.* at 3. Volkert's plans called for furnishing and installing a new disc aerator system in the ditches, including six new disc aerator assemblies. *Id.* Volkert created the design for the new disc aerator assemblies with the assistance of Evoqua Water Technologies, LLC, which provided Volkert with design and product information. *Id.* Volkert used the design and product information provided by Evoqua as the basis of its design for the disc aerator assemblies, which dictated that each disc aerator assembly was to consist of circular aerator discs, torque tubes, motors, gear reducers, torque arms, couplings, bearings, bearing base plates, a remote bearing and automatic lubrication system, and splash shields. *Id.* After being awarded the public bid for the contract for the construction of the project, J & P Construction Co., Inc., entered into a separate contract with Evoqua, in which the two companies agreed to furnish the disc aerator assemblies according to the plans prepared by Volkert. *Id.* at 3–4.

Evoqua designed the disc aerator assemblies based on the conditions at the facility and submitted the designs to J & P for approval by it and Volkert. *Id.* at 4. Volkert and J & P approved Evoqua's designs. *Id.* Once its designs had been approved, Evoqua supplied the disc aerator assemblies. *Id.* In addition to providing designs and equipment, Evoqua sent a representative to

instruct and assist J & P in installing the disc aerator assemblies. *Id.*

Since the first disc aerator assembly was installed in July 2020, the disc aerator assemblies repeatedly failed. *Id.* at 5. Evoqua visited the facility numerous times throughout the project to analyze, assess, and assist in repairing or replacing the failed disc aerator assemblies, or various parts thereof. *Id.* It indicated that at least one of the disc aerator assemblies failed because it had "a bad bearing from the factory." *Id.* After the disc aerator assemblies began to fail, Evoqua guaranteed the City that "the equipment will function properly for years to come." *Id.* While Evoqua has attempted multiple repairs and replacements, such attempts failed and the disc aerator system has never consistently worked as promised or intended. *Id.* On multiple occasions the City gave Evoqua notice of the issues and the opportunity to cure, but Evoqua could not or would not correct the issues. *Id.*

As a result of the failure of the disc aerator assemblies, the City has expended thousands of dollars in additional operating costs, including labor, parts, and equipment related to purchasing and renting temporary aerator equipment, and has received notices of violations from the Mississippi Department of Environment Quality. *Id.* at 5–6. The City will also incur costs in the future which will include a complete replacement of the disc aerator assemblies that were installed during the project. *Id.*

## IV
## <u>Susan Paulsen</u>

Evoqua retained Susan Paulsen, Ph.D., P.E., a civil engineer with expertise in "water quality regulation," "municipal and industrial wastewater treatment, permitting of municipal and industrial wastewater treatment facilities, and evaluating wastewater treatment systems, including operations and maintenance practices and records," to "review documents, data, and information related to the … Ernest E. Jones Wastewater Treatment Plant …; the City's National Pollutant

Discharge Elimination System (NPDES) Permit …; the City's compliance with its NPDES permit; and its practices and operations at the WWTP." Doc. #224-3 at 1, 2.

The City argues that Paulsen's opinions are inadmissible because "[she] is not qualified to testify to any cause of mechanical equipment failures or to the operation and maintenance of the Evoqua disc aerators;" "[her] proffered testimony [includes] legal conclusions;" and each of Paulsen's opinions is unreliable and/or irrelevant. Doc. #225 at 7, 9.

Evoqua responds that "Dr. Paulsen is qualified and provides reliable and relevant testimony that will assist the jury in determining the facts of this case." Doc. #238 at 3.

The City replies that "[s]ince [it] is not making claims about effluent permit compliance[] or the measure of efficiency of the City of Starkville's wastewater operations as a whole, … Paulsen's opinions about whether [it] is a 'bad' wastewater operator are inadmissible;" "since Paulsen has no education or experience as a mechanical engineer and failed to do her own mechanical engineering analysis to determine the reasons why the gearboxes for the aerators continually failed, her 'causation' opinions are inadmissible;" and "Paulsen's opinions of who is at fault invade the province of the judge and jury, and is her own *ipse dixit*." Doc. #246 at 6.

**A. Paulsen's Qualifications**

The City argues that "Paulsen's education and licensure as a civil engineer and her professional experience do not qualify her to testify to" the cause of the mechanical equipment failures or "the operation and maintenance of the Evoqua disc aerators" because her "experience [is in] assisting municipal wastewater treatment plants with permit and regulatory compliance" and "has not involved the operation or maintenance of Evoqua disc aerators." Doc. #225 at 8.

Evoqua responds that "Paulsen obtained an undergraduate degree from Stanford University and two graduate engineering degrees" and "has authored seventeen (17) articles, testified as an

expert at trials and hearings nine (9) times, and has been deposed as an expert sixteen (16) times, including in matters that involved issues very similar to those in this case." Doc. #238 at 5–6.

The City replies that "Evoqua does not cite any education or experience, either in the field or as an expert witness, pertinent to the material issues in this case, which all relate to the design, construction, and operation of a mechanical aeration system;" and "[n]othing in her education or work history evidences any prior experience in diagnosing the causes of failed mechanical equipment, providing mechanical engineering design services for aeration equipment, or operating that equipment." Doc. #246 at 2.

Courts must "gauge whether the 'witness's qualifying training or experience, and resultant specialized knowledge, are sufficiently related to the issues and evidence before the trier of fact that the witness's proposed testimony will help the trier of fact.'" *United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2013) (quoting 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 702.04(1)(b) (Mark S. Brodin, ed., Matthew Bender 2d ed. 2026)). "[I]t is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render an opinion because the witness lacks expertise in specialized areas that are directly pertinent to the issues in question, if the witness has educational and experiential qualifications in a general field related to the subject matter of the issue in question." 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.04(1)(a); *see Wen Chyu Liu*, 716 F.3d at 168 ("A lack of specialization should generally go to the weight of the evidence rather than its admissibility."). And "[a] lack of personal experience … should not ordinarily disqualify an expert, so long as the expert is qualified based on some other factor provided by Rule 702: 'knowledge, skill, experience, training, *or* education.'" *Wen Chyu Liu*, 716 F.3d at 168 (quoting FED. R. EVID. 702)).

Paulsen is a civil engineer whose "expertise includes water quality regulation." Doc. #224-3 at 2. She has "worked on many projects involving municipal and industrial wastewater treatment, permitting of municipal and industrial wastewater treatment facilities, and evaluating wastewater treatment systems, including operations and maintenance practices and records." *Id.* Paulsen testified that some of her work involved "mechanical troubleshooting" and that generally, she relies on mechanical engineers "if detailed mechanical engineering calculations are required" but "sometimes there are problems or failures with mechanical components that are obvious." Doc. #224-2 at PageID 1948. She testified that in this case, some of the mechanical failures are obvious to her "as an engineer with experience in treatment plants and treatment plant design." *Id.* Although she has worked at facilities using Evoqua equipment, she testified that she cannot recall whether she has experience with the specific disc aerators at issue here. *Id.* at PageID 1949.

Paulsen has sufficient education and general experience evaluating municipal wastewater treatment facilities, including operations, maintenance, and mechanical troubleshooting, to qualify her to opine about the mechanical failures at issue in this case. The City's argument that Paulsen is unqualified because she lacks specific experience with disc aerators (and, more specifically, experience with the Evoqua disc aerators at issue here), goes to the weight of her testimony rather than its admissibility.

Paulsen's testimony regarding causation will not be generally excluded based on her qualifications. To the extent the City challenges Paulsen's qualifications as they relate to her individual opinions, those arguments will be addressed below.

### B. Paulsen's Opinions

#### 1. Opinion 1

Paulsen's first opinion ("Opinion 1") is that "[t]he City's failure to properly clean and

maintain the aeration discs increased the loading on the system gearboxes, directly contributing to failure of the disc aerators." Doc. #224-3 at 74.

*a. Relevance & Reliability*

The City argues that Opinion 1 "is irrelevant and unreliable" because Paulsen "concludes that the discs in the oxidation ditch were dirty because the City did not clean them" but "does not use any scientific or specialized knowledge to reach that conclusion;" and "[e]ven if dirty discs caused the equipment to fail, the jury could just as easily conclude that the discs had not been cleaned without Paulsen's testimony as it could with it." Doc. #225 at 9, 11.

Evoqua responds that "Paulsen employed a reliable methodology that is based on her independent assessment of facts and data in the record in reaching her conclusion" "that buildup on the discs caused the disc aerator failure and that the disc aerators worked when routinely cleaned of the debris in Starkville's Plant;" Paulsen "has experience assessing plant operations and maintenance and plant performance which is directly relevant to Evoqua's chief defense" "that the disc aerators failed due to [the City's] insufficient and lackluster operations and maintenance practices;" "[i]t is undisputed that the oxidation ditches where Evoqua's disc aerators operated contained substantial quantities of sludge, rags, old, discarded equipment, and other debris;" and "Paulsen analyzed this condition and determined that [the City's] poor operations and maintenance … impeded the disc aerators' performance." Doc. #238 at 9, 10.

The City replies that Paulsen "did not conduct any testing of the equipment itself or the wastewater, and she did not perform any independent analysis on the design of the disc aerators or the failures of same" but "simply reviewed the data and then opined that [its] failure to properly clean and maintain the aerators was the cause of the mechanical disc aerator failures;" "[her] methodology is lacking because she generally states that 'loading' increases, but does not have

any evidence to support (1) what the contents of 'normal' wastewater is, or (2) how the City's wastewater deviated from that norm;" and "she cannot testify as to whether this increased 'loading' actually caused the gearboxes, and therefore the aerators, to fail" because she is not a mechanical engineer. Doc. #246 at 3, 4.

Paulsen testified that when she visited the facility, in comparison to her experience with other water treatment plants, she observed "more material that had accumulated inside the oxidation ditches than would be typical," "vegetation growing on some of that stuff at the surface of the … aeration systems … that were not operating," "debris that had accumulated on some of the aeration equipment, including the temporary brush aerators," and that "[t]he water quality within the oxidation ditch didn't look the way it should look in a properly functioning system." Doc. #224-2 at PageID 1951. She formed her Opinion 1 based on records regarding the electrical signals into the motors and the movement of the discs which led her to conclude:

> [T]he buildup on … one-third of the discs[] caused an imbalance within the system. The system had to work harder to raise the … side of the discs that had the accumulation or buildup on it, and then work less hard when that fell on the other side. And so that led to increasing oscillation within the electrical signals that were generated by that system. The record also clearly shows that when that material was cleaned off, those oscillations reduced, and the system was more in balance according to its design.

*Id*. at PageID 1952.

As to the determination that increased loading on the gearboxes caused them to fail, Paulsen testified that "[i]t was obvious from the record that there was increased loading," and though she "didn't do calculations of the mechanical loading on the gearboxes," she "reviewed the record as to what the interior of those gearboxes looked like when they were pulled apart, the details related to the electrical signals that the system generated over time, [and] the evidence regarding buildup on the discs," and formed her opinion on causation before any mechanical engineering calculations were done. *Id*. at PageID 1953.

Paulsen concluded that the City was responsible for cleaning the disc aerator assemblies based on her experience with wastewater treatment plants because such cleaning is "part of the normal operations and maintenance that should be occurring at a wastewater treatment plant, and it is the obligation of the owner to perform routine operations and maintenance services." *Id*. at PageID 1957.

Paulsen explained how she formed her opinion after visiting the facility and reviewing records and documentation, which led her to conclude that the accumulation of debris on the discs caused increased loading on the gearboxes, resulting in their failure. Contrary to the City's argument that "review[ing] the data" is not a sufficient basis for her opinion, "an expert witness may base their testimony on pictures of the property, the opinions of other experts, and other documents from third parties." *Cooley v. State Farm Fire & Cas. Co*., 661 F. Supp. 3d 618, 624 (S.D. Miss. 2023) (collecting cases). And though she is not a mechanical engineer and therefore may not be qualified to testify about the mechanical engineering calculations involved in determining, for example, the amount of increased loading, her experience investigating wastewater treatment facilities as a civil engineer is sufficient qualification for her to opine generally that there was increased loading.

As to the City's argument that Paulsen's testimony that it failed to clean the discs would not be helpful to the factfinder, Paulsen can testify about the typical operations and maintenance of a wastewater treatment plant and how failure to clean the discs relates to accumulation of debris on the discs, increased loading on the gearboxes, and ultimate failure of the gearboxes. Such testimony would all be helpful as it is not information within the jury's "common experience and knowledge." *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990) (per curiam).

Because Paulsen's Opinion 1 is relevant and reliable, it will not be excluded.

*b. Legal Conclusion*

The City argues that Opinion 1 "includes Paulsen's legal conclusions on which party was responsible for maintaining the disc aerator assemblies" and "is nothing more than a conclusion about causation and a causal link between the City's alleged failure to clean the Evoqua discs and the repeated equipment failures." Doc. #225 at 9–10.

Evoqua responds that "[the City] has admitted that it is responsible for cleaning;" and Paulsen "is not testifying to the ultimate legal issue or duties of the parties" or "to the legal standard at issue." Doc. #238 at 16, 17.

The City replies that Paulsen is not qualified to testify that it breached "the duties of a municipal wastewater plant operator." Doc. #246 at 4.

Though "[a]n expert may state an opinion even if it 'embraces an ultimate issue,'" "Rule 704 'does not allow an expert to render conclusions of law.'" *United States v. Thomas*, 847 F.3d 193, 205, 206 (5th Cir. 2017) (quoting Fed. R. Evid. 704(b), then quoting *Snap–Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996)). "In distinguishing admissible testimony from inadmissible testimony, the task for the Court is to ask whether the expert's opinions bear on some factual inquiry or whether they bear solely on the legal conclusions that are urged;" so while "an expert may offer [her] opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied … [she] may not testify as to whether the legal standard has been satisfied." *Olivier v. Exxon Mobile Corp.*, 596 F. Supp. 3d 606, 611 (M.D. La. 2022) (quoting *Woodard v. Andrus*, No. 03-2098, 2009 WL 140527, at *2 (W.D. La. Jan. 20, 2009)).

Paulsen's opinion does not indicate that her testimony will include legal conclusions. While the City argues that she may not testify that it breached the duties of a municipal wastewater plant operator, Paulsen does not use these terms, or any terms that would amount to a legal

conclusion, in her opinion. And while Paulsen's opinion that the City failed to clean the discs and that the failure to clean the discs caused the gearboxes to fail may support a legal conclusion, the conclusions in her opinion are factual, not legal. Paulsen's Opinion 1 will not be excluded on this basis either.

**2. Opinion 2**

Paulsen's second opinion ("Opinion 2") is that "[o]ther actions and inactions by the City exacerbated the failures of the disc aeration system. Specifically, the City declined to install a VFD, failed to remove sludge from the oxidation ditches, failed to properly lubricate the equipment, and did not examine whether treatment performance could be improved by addressing industrial discharges to the WWTP."[4] Doc. #224-3 at 76.

The City argues that each opinion contained within Opinion 2 is inadmissible because (1) "Paulsen admitted that she 'can't say whether [it] made a mistake in selecting or not selecting the VFDs,'" "Paulsen's testimony on VFDs is irrelevant and will not assist the jury in any way," and "[w]hether the Evoqua discs would have been easier to clean if VFDs were installed is not an issue here;" (2) "Paulsen's opinion on the impact of removing sludge from the oxidation ditches is irrelevant" because "[t]he likelihood that debris would accumulate on the discs is not at issue here, and neither is the difficulty of cleaning the discs;" (3) Paulsen's statements regarding the "sludge removal and proper equipment lubrication are impermissibly speculative" as "[s]he discusses mere possibilities on whether sludge removal and alleged improper lubrication may have contributed to equipment failures;" and (4) "Paulsen's discussion of industrial wastewater dischargers will not assist the jury" because "[w]hether wastewater from Weavexx caused the City to exceed its wastewater treatment permit limits is unimportant here" and "Paulsen impermissibly presents mere

[4] A "VFD" is a variable frequency drive. Doc. #224-3 at 4.

possibilities for what ‘may have’ accounted for influent loading at the Plant.” Doc. #225 at 13–14 (internal citations omitted).

Evoqua responds that “[a]s part of Dr. Paulsen’s analysis, she considered how debris accumulated and she found that a VFD and/or equipment lubrication would have stopped accumulation;” “[a]s to [the City’s] claims regarding industrial dischargers to the Plant, Weavexx, one such discharger, received at least ten (10) notices of permit violations between 2021 and 2025, and these occurrences must be assessed by an expert making a fulsome analysis of plant performance as Dr. Paulsen did here;” and “any objection that Dr. Paulsen’s Opinion 2 is speculative because she used the word ‘may’ in her report does not disqualify her as an expert as experts are not expected to speak in absolute certainties.” Doc. #238 at 17–18.

The City replies that “permit violations from one industrial customer’s effluent that was going to be filtered and screened even before it reached the oxidation ditches do not have any bearing on whether the wastewater in the oxidation ditches was somehow different than any other wastewater treatment plant;” and “Paulsen’s opinions that discuss mere possibilities are … inadmissible.” Doc. #246 at 5–6.

In her report, Paulsen concludes that “[b]y allowing the disc aerators to rotate at a controllable speed, a VFD would have improved the performance of the aeration discs and facilitated disc cleaning and maintenance;” “inspect[ing] and clean[ing] the oxidation ditches prior to the installation of the disc aerator systems … likely would have improved treatment performance and may also have facilitated disc maintenance;” “the City’s apparent failure to routinely and properly lubricate the aeration equipment may also have contributed to the equipment failures;” and “industrial discharges to the WWTP may have accounted for a significant portion of the total influent loading to the plant during a period when effluent concentrations from

the WWTP exceeded permit limits." Doc. #224-3 at 76–79. Paulsen clarified during her deposition that "there were a variety of things that could have contributed to the failures. [M]y testimony is that the primary causes of failures was the imbalance on the discs and the failure to clean that material, but these other things *could have* also exacerbated those failures." Doc. #224-2 at PageID 1960 (emphasis added).

While "[a] trial court may exclude expert testimony that is imprecise and unspecific or whose factual basis is not adequately explained," *Mahli, LLC v. Admiral Ins. Co*., No. 1:14cv175, 2015 WL 4915701, at *11 (S.D. Miss. Aug. 18, 2015) (quoting *Smith v. Johnson & Johnson*, No. 3:08cv245, 2011 WL 3876997, at *5 (S.D. Miss. Aug. 31, 2011), *aff'd*, 483 F. App'x 909 (5th Cir. 2012)), and courts may exclude testimony as "too speculative" when the expert "never talks in terms of probability, only possibilities," *Hammond v. Coleman Co*., 61 F. Supp. 2d 533, 539, 541 (S.D. Miss. 1999), that is not the case here. In context, Paulsen concludes that the failure to clean the discs was the primary cause of the gearbox failures; she then goes on to list other factors that, in addition to buildup of material on the discs, could have contributed to the failures. The factual basis for her conclusion that these other factors may have contributed is explained thoroughly in her report, and contrary to the City's arguments, this opinion is clearly relevant in helping the factfinder evaluate how or why the gearboxes failed.

However, there is a discrepancy between the wording in Paulsen's Opinion 2, her explanation for this opinion in her expert report, and her deposition testimony. While she stated in her deposition that the other factors "could" have exacerbated the failures and generally uses the words "may have" in her report, her Opinion 2 definitively states that the other factors exacerbated the failures. Paulsen's Opinion 2 will not be excluded but Paulsen will be limited to testifying that the factors listed in Opinion 2 may have or could have exacerbated the failures of

the disc aeration system.

### 3. Opinion 3

Paulsen states in her "Opinion 3" that "[f]ollowing the installation of the disc aerators and during the period Evoqua and others provided assistance to the City (July 2020–July 2022), the WWTP was generally in compliance with its permit. The City's lack of proper operation and maintenance of its WWTP led to multiple instances of non-compliance both before and after this period." Doc. #224-3 at 79.

The City argues that "Opinion 3 is … irrelevant" because "[t]he jury does not need Paulsen's assistance to follow a timeline of the Plant's compliance with wastewater treatment permit requirements." Doc. #225 at 15.

Evoqua responds that Paulsen's opinion "clearly is helpful to the jury in understanding how the lack of cleaning and accumulation of buildup affected permit compliance, which is highly relevant to the jury's assessment of [the City's] allegation that the disc aerators did not work" and is also "relevant because [the City] alleges damages resulting from violations of wastewater permitting that [the City] contends were caused by Evoqua's disc aerators." Doc. #238 at 12–13

The City replies that permit violations do not "suggest that [its] wastewater was somehow different from a normal or reasonable wastewater treatment plant," and "MDEQ was not measuring the amount or type of solids in [its] oxidation ditches." Doc. #246 at 5.

The City's second amended complaint alleges that it "has received notices of violations from the Mississippi Department of Environmental Quality due to the failure of the Disc Aerator Assemblies." Doc. #98 at 6. Given this allegation, Paulsen's opinion that the noncompliance occurred primarily while the City was not receiving maintenance assistance due to the City's lack of proper maintenance is relevant. And contrary to the City's argument that Paulsen's testimony

is unnecessary "to follow a timeline of the Plant's compliance," Paulsen's Opinion 3 is helpful to the factfinder in that it provides context and an explanation for the facility's compliance with permit requirements over time. So, Opinion 3 is relevant and will not be excluded.

**4. Rebuttal Opinion 1**

In his expert report, the City's expert witness Wes Cardwell, P.E., states that "[b]ecause of the recurring failures of the disc rotor system, the []WWTP has had difficulty maintaining adequate aeration for the biological treatment process and has had to rely on temporary floating equipment to serve this purpose." Doc. #228-2 at 12.

In her "Rebuttal Opinion 1," Paulsen opines that "Cardwell failed to acknowledge that the WWTP was largely in compliance with its permit when the disc aerators were operating and Evoqua and others were supporting the City, but largely out-of-compliance while operating the temporary floating equipment." Doc. #224-3 at 82.

The City argues that Paulsen's Opinion 3, which she reoffers to rebut portions of Cardwell's report related to new aeration equipment, "is not relevant to whether the Plant has had difficulty maintaining adequate aeration in its oxidation ditches or to the reason the new aeration equipment was chosen to replace the Evoqua equipment," "[b]ut even if it was relevant to those questions, those are not at issue here;" and "Rebuttal Opinion 1 essentially amounts to a fact dispute rather than a difference of opinion between two experts" and "will not help the jury to understand any evidence or to determine a fact at issue." Doc. #225 at 16.

Evoqua responds that "Paulsen's ultimate conclusions … that [the City's] deficient operations and maintenance programs caused the disc aerators to underperform, and the disc aerators generated a compliant effluent cleaned of the debris in [the City's] plant … are not merely disputes of fact as [the City] contends; they are technical conclusions based on her experience and

expertise." Doc. #238 at 14.

For the same reasons described above, Rebuttal Opinion 1 and Opinion 3 are relevant to rebut Cardwell's opinion. Since the City alleges that the failure of the disc aerator assemblies caused it to be out of compliance, whether it was still out of compliance while utilizing the temporary floating equipment is relevant to Cardwell's opinion regarding the City's reliance on the temporary equipment. Paulsen's Rebuttal Opinion 1 will not be excluded.

**5. Rebuttal Opinion 2**

Cardwell opines:

> Based on the information I have reviewed, the need to clean the discs was not suggested/discovered until December 2021, at the earliest. Cleaning procedures are not documented in the submitted operations and maintenance manual. Disc failures have continued to occur after the discs have been cleaned. As previously noted, staff reported that these cleaning practices were in accordance with and at the frequency of which recommended by Evoqua.

Doc. #228-2 at 12. In her "Rebuttal Opinion 2," Paulsen states that "Cardwell's opinions regarding the City's efforts to clean the disc aerators are unsupported and incorrect, and [her] opinion remains that the City's failure to clean the disc aerators was a primary cause of their failure." Doc. #224-3 at 83.

The City argues that Rebuttal Opinion 2 is "unnecessary" because "[t]he jury does not need Paulsen's assistance to determine whether the disc aerators were cleaned and can 'adeptly assess this situation using only their common experience and knowledge.'" Doc. #225 at 17 (quoting *Peters*, 898 F.2d at 450).

Evoqua responds that Rebuttal Opinion 2 "is based on Dr. Paulsen's analysis of cleaning records that she compared with records of the Plant's performance and the amp variability data," and "[s]uch analysis, contextualized by Dr. Paulsen's expert understanding of how the nature of the Plant's wastewater could contribute to or cause solids buildup, is needed by the jury to help

them see how failed maintenance stopped the Plant from functioning properly." Doc. #238 at 18–19.

Paulsen explains in her report that "Evoqua stated that disc cleaning should be performed to maintain an '*amp variation of less than 5 amps*,' but the City's failure to clean the discs as recommended by Evoqua is confirmed by amp variability that exceeded 5 amps throughout much of 2022." Doc. #224-3 at 83 (footnote omitted). While the City is correct that expert testimony is "unnecessary" when the factfinder can "adeptly assess th[e] situation using only their common experience and knowledge," *Peters*, 898 F.2d at 450, Paulsen's opinion here is based in part on her reading of the amp variability and its relationship to cleaning of the disc aerators, which is not within the "common experience and knowledge" of the jury, *id*. Accordingly, Paulsen's Rebuttal Opinion 2 is helpful to the jury and will not be excluded as unnecessary.

**6. Rebuttal Opinion 3**

Cardwell opines:

> The ability for solids to accumulate only on isolated portions/segments of the discs when being rotated 57 RPM does not seem likely. Any growth or debris accumulation on the discs is more likely to be present over the entire circumference of the disc if continuously operated. Staff indicated that the discs have only been turned off when either the unit is inoperable, is being cleaned, or during high flow events. When turned off for high flow events or cleaning, staff noted that this period of time is kept short and is not long enough to allow for solids accumulation.

Doc. #228-2 at 12. Paulsen's "Rebuttal Opinion 3" is that "[w]hile Mr. Cardwell noted that 'the ability for solids to accumulate only on isolated portions/segments of the discs when being rotated 57 RPM does not seem likely,' [her] observations at the site, together with additional documentation and evidence, clearly show debris accumulation within the oxidation ditches and on isolated portions of the discs." Doc. #224-3 at 83–84.

The City argues that Rebuttal Opinion 3 is unreliable because "[i]nstead of forming an opinion based on her own expertise … Paulsen[] attempt[s] to parrot the conclusions Evoqua

reached without doing her own investigation" since she "has 'never experienced or seen in her career buildup on an aeration system such as what happened at Starkville's plant'" and "has 'never seen electrical signals that indicated those failures like this.'" Doc. #225 at 17–18 (internal citations omitted).

Evoqua responds that "Paulsen disagrees with Mr. Cardwell's opinion that accumulation of solids on isolated portions of the discs when being rotated does not seem likely based on her own, *personal* observations at the site, together with 'additional documentation and evidence that clearly show debris accumulation within the oxidation ditches and on isolated portions of the discs.'" Doc. #238 at 19.

The City's contention that Paulsen's opinion is not based on her own expertise or investigation is clearly without merit, as Paulsen stated in her report that her opinion was formed based on her personal observations when she visited the facility as well as her own review of documents and records. *See Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 303 (5th Cir. 2024) (while "an expert cannot forgo her own independent analysis and rely exclusively on what an interested party tells them," "an expert can rely on information provided by a party's attorney" in forming independent opinion). And as discussed above, Paulsen's lack of prior experience with the specific situation at issue here goes to the weight of her testimony, not its admissibility. *Wen Chyu Liu*, 716 F.3d at 168. So, Paulsen's Rebuttal Opinion 3 will not be excluded.

**7. Rebuttal Opinion 4**

Cardwell's report states:

> Consideration of the contents of the oxidation ditch and understanding the intervals at which the oxidation ditch has or has not been cleaned out should have been discussed with staff and considered during technology selection and design. This information should have been coordinated by Volkert with Evoqua to confirm the technology is appropriate based on the existing conditions and capable of operating in conjunction with the standard operating practices of the facility.

Doc. #228-2 at 13. In "Rebuttal Opinion 4," Paulsen opines that "Mr. Cardwell inappropriately suggested that Evoqua should have considered the existing conditions and operating practices of the WWTP, and that doing so would have led to selection of a different aeration technology." Doc. #224-3 at 84–85.

The City argues that "Rebuttal Opinion 4 is another attempt by Paulsen to present legal conclusions to the jury in the form of expert testimony;" and to the extent "Rebuttal Opinion 4 recounts some of the opinions described above … [it] should be excluded for the same reasons previously discussed." Doc. #225 at 18.

Evoqua responds that "this opinion is not testifying 'as to whether the legal standard has been satisfied' or even opining on whether Mr. Cardwell was attempting to testify as to a legal conclusion," and "experts are allowed to disagree with one another without reaching into the realm of improper legal conclusions." Doc. #238 at 19.

During her deposition, Paulsen elaborated that contrary to Cardwell's opinion, she has "not concluded that discs are an inappropriate technology, and … the data and evidence indicate that when they're properly maintained, that they work well in this plant;" and "Evoqua's providing equipment and the troubleshooting process that they went through with City staff and with others was appropriate and was consistent with what [she is] used to seeing in the industry." Doc. #224-2 at PageID 1966.

To the extent the City takes issue with Paulsen's testimony regarding what Evoqua should or should not have done, Paulsen may testify as to what an equipment provider should do without improperly presenting a legal conclusion. *See Butler v. BNSF Railway Co.*, No. 1:22-CV-00367-MJT, 2024 WL 2735020, at *5 (E.D. Tex. Mar. 26, 2024) ("Expert testimony is often required to establish an industry's standard of care. … Accordingly, Mr. Ogden could testify, for example, by

explaining to the jury what industry standards are and how, in his opinion, Defendant's actions failed to meet those standards.") (internal citation omitted). And to the extent Rebuttal Opinion 4 recounts Paulsen's other opinions, it will not be excluded for the same reasons those opinions will not be excluded.

**8. Rebuttal Opinion 5**

Cardwell opines:

> … The effluent weirs are being replaced and will be installed and configured to operate with a maximum water surface elevation of 309.72, as was designed when both ditches were originally constructed. As such, the maximum immersion of the brush rotors will be no different than as would be anticipated or previously designed with the previous equipment. No consideration was made for additional aeration capacity to meet future capacity needs. To meet the projected wastewater volumes identified as part of the facilities plan, future improvements will consist of a flow equalization basin and, ultimately, construction of a third oxidation.
>
> Because of the discrepancies between the information contained in the 1980 construction drawings, the Lakeside Operations and Maintenance Manual, the observations made during the site visit, and the unknown structural characteristics of the existing structure, Garver recommended that improvements be made to the structure that were specifically designed to provide the necessary support for the proposed equipment. These structural improvements include replacement of the assembly box and supporting columns and drilled piers due to the unknown condition and characteristics of the existing foundation system.

Doc. #228-2 at 14. Paulsen's "Rebuttal Opinion 5" is that "Cardwell's report includes improvements unrelated to the Evoqua aeration systems or their performance." Doc. #224-3 at 85.

The City argues that "Rebuttal Opinion 5 is Paulsen's attempt to instruct the jury on Evoqua's contractual duties for the Project—a question of the law for the court" because she references "Evoqua's quotation for the disc aeration system;" and "Paulsen also lacks the requisite qualifications to testify to Rebuttal Opinion 5" because "she has no experience working with the disc aerators that were installed at the Plant[ and t]here is no evidence that she has sufficient knowledge or experience to opine as to what improvements at the Plant 'relate to' the performance of the disc aerators." Doc. #225 at 18–19.

Evoqua responds that "Paulsen is not attempting to instruct the jury as to legal obligations" but rather offering "a technical opinion about the equipment [the City] is implementing as part of its improvement plan" "to point out that [the City] is improving portions of the Plant … not properly included in [the City's] alleged damages." Doc. #238 at 20.

Paulsen notes in her report that "Evoqua's quotation for the disc aeration system expressly excluded 'modifications to equipment or structures.'" Doc. #224-3 at 85 (emphasis omitted). Paulsen testified at her deposition that "as an equipment supplier, Evoqua is not responsible for the condition of the concrete or foundation of the ditches;" and she "saw no evidence in the record that the condition of the concrete or the foundation had anything to do with the performance of the aeration system during the time period when it was operational." Doc. #224-2 at PageID 1966, 1967.

Though Paulsen references Evoqua's quotation in her report, her opinion is not based only on the quotation but also on her independent review of records and her knowledge and experience with wastewater treatment facilities. Her lack of experience with the specific disc aerators at issue here does not disqualify her from opining about whether the condition of the concrete and foundation of the ditches was "related to" the performance of the aerations system. *Wen Chyu Liu*, 716 F.3d at 167. Paulsen's Rebuttal Opinion 5 will not be excluded; however, in testifying about her Rebuttal Opinion 5, she should not offer an opinion as to Evoqua's contractual duties, as doing so would constitute an improper legal conclusion. *See Stewart v. Family Dollar, Inc.*, No. 23-314, 2025 WL 2787898, at *13 (M.D. La. Sep. 11, 2025) (excluding expert "testimony as to what the parties' 'responsibilities' were under the two contracts at issue" as "legal conclusions").

**9. Rebuttal Opinion 6**

Cardwell's report states:

> … The design oxygen transfer rate, as indicated in the approved disc aerator equipment submittal, was 4.75 pounds of oxygen per hour (lbs. O2/hour) per disc at 24-inches of immersion and an operating speed of 52 RPM. With 42 discs per aerator, and three aerators per ditch, this produces an overall aeration capacity of 1,200 lbs. O2/hour (28,800 lbs. O2/day) with all units in service. … At 55 RPM and 19-inches of immersion, the indicated oxygen transfer rate is 2.28 lbs. O2/hour – which equates to 575 lbs. O2/hour (13,800 lbs. O2/day) with all units in service. This is a reduction of approximately 50%.

Doc. #228-2 at 13. In "Rebuttal Opinion 6," Paulsen opines that "Mr. Cardwell is incorrect in stating that the disc aeration system as installed provided 50% less aeration capacity than the design, and Garver's proposed future design incorporates additional aeration capacity beyond the design capacity of the disc aeration system." Doc. #224-3 at 85–86.

The City argues that Paulsen's comparisons of "the oxygen transfer capacity of the disc aerators to the capacity of equipment the plant previously used and the equipment that will be used in the future … are not relevant to any issue in this action;" "Paulsen admits that the disc aerators, as installed, did not meet [the project] requirement;" and "[h]er explanation that the disc aerators had more oxygen transfer capacity than the equipment installed in 1980 and 2002 is unnecessary and irrelevant." Doc. #225 at 19 (internal citations omitted).

Evoqua responds that "this opinion is directly relevant to rebut Mr. Cardwell's incorrect and misleading conclusion and will help the jury determine that the disc aerator system as installed by [it] did work when it was cleaned and properly maintained as evidenced by the data and calculations provided in Dr. Paulsen's report;" Paulsen "concluded, based on [her aeration capacity] calculations, that the equipment provided sufficient treatment capacity (so long as [the City] properly operated and maintained it) for the plant to remain in compliance with its permit;" and "Paulsen demonstrated that Mr. Cardwell's calculations were wrong because they were based on incorrect assumptions." Doc. #238 at 20, 21 (emphasis omitted).

Paulsen explained that the comparisons in Rebuttal Opinion 6 were "to be able to

quantitatively evaluate the oxygen transfer capacity in the various systems and see how they compared, and to sort of evaluate what oxygen transfer capacity would be required … for this plant to be able to comply with its permit;" and "to look at the oxygen transfer capacity for the future planned improvements and evaluate how they compare with the oxygen transfer capacity of the systems that have been historically installed at the plant[; s]o it informs our understanding both of the performance of the plant from its inception to now, and our evaluation of the oxygen transfer capacity that's planned for the plant in the future." Doc. #224-2 at 1968.

The oxygen transfer capacity of future planned improvements is relevant to damages since the City alleges that it will "incur damages in the future which will include a complete replacement of the Disc Aerator Assemblies" with a new system. Doc. #98 at 6. And the oxygen transfer capacities of previous systems are also relevant to replacement damages to the extent Cardwell's report states that the replacement system "was designed to provide an aeration capacity similar to that of previous systems and when the oxidation ditches were originally placed into service." Doc. 228-2 at 14.

Accordingly, Paulsen's Rebuttal Opinion 6 will not be excluded.

**10. Rebuttal Opinion 7**

In "Rebuttal Opinion 7," Paulsen opines that "I disagree with [the City's expert] Dr. [George] Ford's statements that WWTP staff performed proper operation and maintenance at the WWTP. In fact, the City's failure to properly operate and maintain the disc aeration system contributed to the failures of that system." Doc. #224-3 at 86–87.

The City argues that "[Paulsen] refers to Opinions 1 and 2 from her report as the basis for the disagreement;" and Rebuttal Opinion 7 should be excluded for the same reasons that Opinions 1 and 2 should be excluded. Doc. #225 at 19 (internal citations omitted).

Evoqua responds that Rebuttal Opinion 7 "is supported by documentation, or lack thereof, reviewed and analyzed by Dr. Paulsen concerning proper operation and maintenance of the disc aerators;" and "Paulsen is qualified to testify about plant performance and how improper plant operations impact plant performance, as evidenced by her experience evaluating operations and maintenance of wastewater treatment systems." Doc. #238 at 21.

Because Paulsen's Opinions 1 and 2 will not be excluded, her Rebuttal Opinion 7 will not be excluded either, but any testimony regarding additional contributing causes will be limited in the same way that her Opinion 2 will be limited.

**11. Supplemental Opinion 1**

In "Supplemental Opinion 1," Paulsen opines that "Oxidation Ditch 1 contained at least 3 feet of sludge, which reduced the retention time in that ditch by approximately 30%." Doc. #224-4 at 3–8.

The City argues that "Supplemental Opinion 1 is irrelevant" because "there is no apparent relationship between a reduced hydraulic retention time and any issue in this case;" "[f]or example, she does not opine that a reduced hydraulic retention time somehow affected the performance of the disc aerators[, n]or does she have an opinion on the hydraulic retention time from 2020 through 2023, when the relevant equipment installations and failures occurred." Doc. #225 at 20.

Evoqua responds that "[the City's] contention that this opinion is irrelevant is demonstrably wrong because reduced hydraulic retention time means reduced treatment, thus affecting the Plant's ability to meet its permit requirements: a harm specifically alleged by [the City]." Doc. #238 at 11.

The City replies that Paulsen's opinions regarding "solids retention time" "would [not] be helpful to a fact-finder as to why the gearboxes failed;" and Paulsen "cannot reliably connect the

dots as to how sludge volume affects the performance of aerators at all or how sludge volume in 2025 affected or relates to aerator performance in 2020-2022." Doc. #246 at 4–5.

Paulsen notes in her report that it appeared to her during her visit to the facility that the oxidation ditches "were never cleaned prior to June 2025" and "debris accumulation was significant." Doc. #224-4 at 3. She also explains that "because 30% of the volume of Oxidation Ditch 1 was comprised of sludge, the amount of time wastewater would be treated within the oxidation ditch was reduced by 30%." Doc. #224-4 at 7–8.

The reduction in retention time is relevant in that the City's reduced ability to treat wastewater relates to its damages, specifically the damages regarding permit violations. And though it appears there is no way to determine exactly how much sludge was in Oxidation Ditch 1 in 2020 through 2023, Paulsen's opinion that the ditches had not been cleaned from the time the facility began operating until 2025 and that there was significant debris in the ditches when she visited in 2024 would be relevant to the factfinder in determining whether there was also significant debris in the ditches from 2020 through 2023, contributing to reduced retention time during that time period. Accordingly, Paulsen's Supplemental Opinion 1 will not be excluded.

**12. Supplemental Opinion 2**

In "Supplemental Opinion 2," Paulsen opines that "[t]he WWTP was generally in compliance with its permit when Evoqua and others provided assistance to the City (July 2020-July 2022) despite the large quantities of sludge present inside Oxidation Ditch 1." Doc. #224-4 at 8.

The City argues that "Supplemental Opinion 2 is nearly identical to Opinion 3 … and is inadmissible for the same reason." Doc. #225 at 20.

Evoqua responds that the City's "allege[d] damages resulting from violations of

wastewater permitting that [the City] contends were caused by [its] disc aerators" "opened the door for Dr. Paulsen's wastewater permitting analysis and testimony, including Supplemental Opinion 2." Doc. #238 at 13–14.

For the same reasons that Paulsen's Opinion 3 will not be excluded, her Supplemental Opinion 2 will not be excluded either.

**13. Supplemental Opinion 3**

In "Supplemental Opinion 3," Paulsen opines that "[t]he WWTP received a new NPDES permit that contains new discharge limitations for ammonia and copper." Doc. #244-4 at 9.

The City argues that "[t]he fact that [it] received an updated permit is irrelevant to the issues in this action;" and "the jury will not need Paulsen's assistance to understand that [it] received an updated permit." Doc. #225 at 20–21.

Evoqua responds that "Paulsen issued this opinion to confirm that the new permitting did not change her opinions in this matter," and it "is relevant to her discussion of the conditions of the Plant and its permitting compliance" because it "gives the jury a fuller picture of how the Plant receives and operates under its permits." Doc. #238 at 21.

Paulsen's Supplemental Opinion 3 relates to the NPDES permit issued on September 18, 2025. Doc. #224-4 at 9. Though the purpose of Paulsen's opinion is to clarify that this new permit does not change her other opinions, the Court sees no reason that the issuance of a new permit would be relevant to any issue in this case. Since no evidence of the September 2025 permit should be introduced, there is no need for Paulsen to testify that this permit did not change her opinion. Accordingly, Paulsen's Supplemental Opinion 3 will be excluded as irrelevant and unnecessary.

**14. Supplemental Opinion 4**

In "Supplemental Opinion 4," Paulsen opines that "Weavexx Corporation continues to

discharge in excess of its permit limitations and likely continues to contribute to material accumulation in the oxidation ditch." Doc. #244-4 at 10.

The City argues that "Supplemental Opinion 4 is impermissibly speculative and is not based on sufficient facts or data" because "[Paulsen] cannot point to any information to support her guess that the wastewater Weavexx discharges to the Plant contains any fibrous materials that eventually affect the disc aerators." Doc. #225 at 21.

Evoqua responds that "this opinion bolsters the portion of Dr. Paulsen's original Opinion 2 regarding industrial dischargers, which is based on photos and records of waste from the industrial dischargers, by demonstrating that one such industrial discharger, Weavexx, continues to be cited for violations;" and "any objection that Supplemental Opinion 4 is speculative because Dr. Paulsen used the word 'may' in her report does not disqualify her as an expert as experts are not expected to speak in absolute certainties." Doc. #238 at 22.

For the same reasons that Paulsen's Opinion 2 will not be excluded, her Supplemental Opinion 4 will not be excluded. However, to the extent she states in her report that "[t]he ongoing discharges of industrial wastewater from Weavexx *may* continue to contribute fibrous material and solids, which *may* impact the performance of the oxidation ditch," Doc. #224-4 at 10, as with Opinion 2, her opinion does not align with the language of her report in that her Supplemental Opinion 4 states that Weavexx *likely* contributes to accumulation of material. Like Opinion 2, Paulsen will be limited to testifying that Weavexx *may* contribute to material accumulation in the oxidation ditch.

**15. Supplemental Opinion 5**

In "Supplemental Opinion 5," Paulsen opines that "[her] oxygen transfer estimates are consistent with Evoqua's calculations in its design spreadsheet." Doc. #224-4 at 11.

The City argues that "[w]hether Paulsen's calculations are similar to Evoqua's is irrelevant to any issue here;" and "if both Paulsen's calculations and Evoqua's calculations are presented at trial, the jury will not need Paulsen's help to determine whether the calculations are similar." Doc. #225 at 21.

Evoqua responds that Supplemental Opinion 5 is relevant because "Paulsen is describing how her calculations are consistent with Evoqua's calculations," which "lends to Evoqua's defense in this matter" and "the reliability of Dr. Paulsen's methodology." Doc. #238 at 22.

Since both Paulsen's and Evoqua's calculations may be presented to the jury, the Court agrees with the City that Paulsen's Supplemental Opinion 5 will not be helpful to the jury because the jury can determine "using only their common experience and knowledge," *Peters*, 898 F.2d at 450, whether the calculations are consistent. Accordingly, Paulsen's Supplemental Opinion 5 will be excluded.

**16. Supplemental Opinion 6**

Paulsen's "Supplemental Opinion 6" is that "[she] requested the SCADA amp draw data recorded by the City during the period in which the disc aerators were operational, but [she] was informed that such data do not exist." Doc. #224-4 at 12.

The City argues that "Supplemental Opinion 6 is not proper expert testimony" because "[i]t is not based on any scientific, technical, or other specialized knowledge." Doc. #225 at 21–22.

Evoqua responds that Supplemental Opinion 6 "is relevant … because it demonstrates a limitation of Dr. Paulsen's analysis caused by the unavailability of data that only [the City] had access to;" and "Dr. Paulsen is providing the parameters of not only the data available to her, but also of her analysis to the factfinder." Doc. #238 at 22–23.

Paulsen elaborates in her report that "[t]he City provided the Defendants with amp draw

data collected between December 2021 and September 2022[;] Evoqua analyzed these data and prepared [a] graphic illustrating the standard deviation of the amp draws;" "[i]n [her] deposition … [she] was asked several questions regarding the relationship between the standard deviation data … and the actual amperage data recorded in the City's SCADA system;" and "[t]o further evaluate the SCADA data that were recorded by the City, [she] requested the SCADA amp draw data from Counsel, but [she] was informed that the data no longer exist." Doc. #224-4 at 12–13.

Though Supplemental Opinion 6 in itself is not based on scientific, technical, or other specialized knowledge, it provides information regarding Paulsen's analysis that would not otherwise be known to the factfinder and is relevant to the factfinder in evaluating some of her other opinions. For this reason, Supplemental Opinion 6 will not be excluded.

**C. Summary**

Paulsen's Supplemental Opinion 3 and Supplemental Opinion 5 will be excluded. Paulsen's other opinions will not be excluded but her Opinion 2, Rebuttal Opinion 5, Rebuttal Opinion 7, and Supplemental Opinion 4 will be limited as specified above.

## V
## AJ Schrauth

Evoqua retained AJ Schrauth, Ph.D., P.E., a mechanical engineer with "expertise in machine design, manufacturing, mechanical testing, and dynamics," "to evaluate the mechanical loading of the aerator drive gearboxes" and respond to the proposed expert testimony of the City's expert Dr. Ford. Doc. #230-2 at PageID 3205, 3206.

The City argues that Schrauth's "opinions related to causation, including opinions numbered 3, 4, 5, and 6 in Schrauth's report, are … unreliable" because they "are nothing more than his subjective belief and speculation as to the cause of the failures;" "Schrauth's opinion that current draw fluctuations observed for aerator motors were consistent with imbalanced mass built

up on the aeration discs should be excluded" "because it is unreliable and will not help the jury to understand the evidence or determine any fact at issue;" and "Schrauth's opinions related to Dr. George Ford's proposed expert witness testimony should be excluded" as "unreliable." Doc. #231 at 7, 8.

Evoqua responds that "Schrauth confirmed, through meticulous and reliable mechanical-engineering calculations, that the buildup observed on the discs could in fact cause enough weight imbalance to wear on the gearboxes and ruled out an alternative explanation, proffered by [the City's] expert, Dr. Ford, that side loading caused the gearbox failures;" and "Schrauth's conclusion is supported by a reliable methodology in that it is based on his independent assessment of facts and data in the record and corroborated by the gearbox manufacturer's own failure analyses." Doc. #239 at 4.

The City replies that Evoqua's explanation of "the methodology it believes Schrauth used to reach his conclusion that torque overload caused the subject gearboxes to fail … differs from Schrauth's;" "[b]ased on Schrauth's testimony, facts exist that could support alternative causes that Schrauth did not rule out;" and "Schrauth's rebuttal testimony is unreliable due to his reliance on information that does not conform to the available evidence." Doc. #247 at 2, 7, 8.

## A. Causation

### 1. Meaning of "overload"

The City argues that Schrauth's belief "that 'torque overload' caused the Evoqua disc aerators to fail … is primarily based on three inspection reports from Dodge Mechanical Power Transmission Company, the manufacturer of the subject gearboxes, for three failed gearboxes;" Schrauth incorrectly "assumes that 'overload,' as used by Dodge in its reports, means 'torque overload;'" "[t]here is no indication that Schrauth would have reached the same conclusion on

causation if he had not incorrectly assumed that 'overload' meant 'torque overload;'" and "[w]hile Schrauth relies on Dodge inspection reports to form his causation opinions, his conclusions contradict the facts at hand" because "Dodge told Evoqua that pulsating loads should not cause torque issues." Doc. #231 at 5–6, 7.

Evoqua responds that Schrauth formed his opinion regarding torque overload after he "analyzed record evidence of the operation of the disc aerators, including motor performance data and contemporaneous observations of buildup on the discs;" and "Schrauth did not misinterpret Dodge's use of 'overload'" or rely "primarily on Dodge's failure analyses." Doc. #239 at 5, 7.

The City replies that "Schrauth's conclusions are not based on any independent analysis of the loads the gearboxes could tolerate; rather, they are based on Evoqua's own opinions about the expected conditions" because "he simply parrots Evoqua's own opinion that a current fluctuation of greater than five amps is excessive;" "Schrauth cited a single Evoqua daily report from December 3, 2021, in support of [his torque overload conclusion]" but "[t]he December 3 report was not contemporaneous with any of the motor data available to Schrauth;" and "Schrauth should not be allowed to testify to his own subjective belief of the meaning of the words used in Dodge's revised, intentionally vague reports." Doc. #247 at 2, 3, 5.

In his expert report, Schrauth writes that "[t]hree failed gearboxes were sent to Dodge for analysis" and "Dodge determined that all three of these gearboxes failed due to overload. In the context of a gearbox failure analysis, 'overload' means the power or torque transmitted through the gearbox was too high, too often, and/or for too long and caused the observed failures." Doc. #230-2 at PageID 3213 (footnotes omitted). Schrauth concludes after a review of the Dodge reports that "[t]he scope of the damage described in the Dodge reports is consistent with a torque overload." *Id.* at PageID 3214. When asked during his deposition whether Dodge meant "torque

overload," Schrauth responded that "[w]hen I look at Dodge's report as an engineer and evaluate what they wrote and the damage that they observed, and they say it's [overload], it means torque overload to me." Doc. #230-6 at PageID 3263.

Based on Schrauth's testimony, his determination that "overload" means "torque overload" was not just an assumption but was made after evaluating the Dodge reports and concluding that the damage reported is consistent with torque overload. Whether Schrauth was correct in his interpretation is for the factfinder to determine and is not an appropriate basis to exclude his testimony. *See Johnson*, 685 F.3d at 459 ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable.") (quoting *Moore*, 151 F.3d at 276). Schrauth's testimony will not be excluded on this basis.

**2. Alternative causes**

The City argues that "Schrauth's failure to rule out alternative causes further renders his causation opinions unreliable" because he "admitted that damage to the equipment could have been caused by metal components entering into the gear mesh and being over-rolled by gear teeth" or "the condition of the oil in the gearboxes." *Id*. at 7.

Evoqua responds that "Schrauth considered and ruled out alternative explanations, such as side loading," and even if he did not, "the alternative causes identified by [the City] are not obvious because there is no strong evidentiary connection in the record between the claimed alternative causes and the claimed injury." Doc. #239 at 8, 9–10.

The City replies that "[b]ased on Schrauth's testimony, facts exist that could support alternative causes that Schrauth did not rule out;" and "there are sufficient evidentiary connections between the possible causes of the gearbox failures and the facts of this case such that those

alternative causes are 'obvious'" since Schrauth "admitted that he has not ruled out two of those explanations" and his "attempt to rule out excessive side loading contradicts the facts underlying his conclusion." Doc. #247 at 7–8.

An expert offering an opinion as to causation must exclude alternative causes. *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000). "If an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." *Lilley v. Home Depot U.S.A., Inc.*, 567 F. Supp. 2d 953, 958 (S.D. Tex. 2008) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001)).

Schrauth testified that the Dodge report noted that "the condition of the oil could be a contributing factor. So poor maintenance could have also played a role. It's hard to tell that because the oil has been through a gearbox going through failure, so you don't know how much that oil degradation occurred during that failure or before." Doc. #230-6 at PageID 3278. It appears from this testimony that Schrauth considered the condition of the oil and concluded that while it could have contributed to the damage, torque overload was still the primary cause of the damage.

Schrauth testified that he did not rule out "consequential damage from metal components from other things … that entered the gear mesh and was, essentially, entrained and over-rolled by the teeth" because it "doesn't seem relevant to [him], and it doesn't seem consistent with the rest of the evidence, that [he would] be worried about exactly what order all the consequential damage occurred." Doc. #230-6 at PageID 3281. He confirmed that "torque overload first is the most consistent with these failure reports;" and under the "facts in this case" there is no scenario "where torque overload occurred secondary to other failures that were evidenced by … the Dodge report." *Id*. Even though Schrauth did not rule out this potential secondary cause of damage, it was not

necessary for him to do so to conclude that torque overload was the primary cause.

Schrauth ruled out side loading as a possible cause in his report based on his determination that the damage was not consistent with side loading. Doc. #230-2 at 10. And despite the City's argument that this conclusion conflicts with the facts since "Dodge described damage[] to th[e] parts [associated with side loading damage] in all three of its reports," Doc. #247 at 6, Schrauth explained that he eliminated side loading by looking "holistically" at the three reports, because "if the damage was caused by side loading on the output bearing -- or output shaft, all of them would have output bearing damage," but one report had "no damage to the output bearings at all." Doc. #230-6 at 3291.

Because Schrauth considered the alternate causes proposed by the City but still concluded that the damage was caused by torque overload, his opinion will not be excluded for failure to consider alternative causes.

**B. Opinion 4**

In his "Opinion 4," Schrauth opines that "[t]he current draw fluctuations observed for several of the aerator motors were consistent with imbalanced mass built up on the aeration discs." Doc. #230-2 at PageID 3203.

The City argues that this opinion "is unreliable and will not help the jury to understand the evidence or determine any fact at issue" because Schrauth "did not attempt to determine the amount of the observed current fluctuation that was, in fact, caused by accumulation of some material" or "determine the extent to which other factors contributed to the current variations." Doc. #231 at 8.

Evoqua responds that "an expert need not testify with absolute certainty about his conclusions;" and "Schrauth reasonably and soundly relied upon contemporaneous reports and

videos confirming the existence of buildup on the discs, and determined that the current and torque fluctuations were consistent with imbalance caused by the observed buildup." Doc. #239 at 7.

Whether Schrauth determined the amount of current fluctuation that was actually caused by accumulated material versus by other factors has no bearing on his conclusion that the current fluctuations were *consistent with* imbalanced mass on the aeration discs. Schrauth calculated the amount of mass accumulation on a portion of a disc that would be required to cause the current to fluctuate to a certain magnitude, then applied those calculations to the thickness of built-up material and the observed fluctuations. While this alone may not be a sufficient basis to conclude that the accumulated material *caused* the fluctuations, it is a sufficient basis for Schrauth's conclusion that the amount of accumulated material was consistent with the fluctuations observed. Schrauth's Opinion 4 will not be excluded for this reason.

**C. Rebuttal to Ford's Testimony**

The City argues that "the facts contradict [Schrauth's] conclusion that … side loading did not occur" because "[a]ccording to Dodge, some of [the] components [associated with the output hub] were, in fact, damaged in the failed gearboxes;" and "Schrauth's opinion regarding the sufficiency of the gearbox output bearings is not supported by sufficient data" because "Schrauth did not consider the rated load for the Dodge bearings that were on the gearboxes." Doc. #231 at 8, 9.

Evoqua responds that "Schrauth's testimony is a detailed explanation, supported at each step by scientific principles, of why Dr. Ford's analysis is flawed and unreliable, which is essential in assisting the trier of fact when weighing conflicting expert evidence;" "Schrauth further refutes Dr. Ford's proposed 'alternative explanations' for the gearbox failure by testing them, something that Dr. Ford did not do;" "the rated load for identically sized bearings are similar regardless of

manufacturer;" and "[the City] misses that Dodge's after-the-fact calculations wrongly assumed a sixty degree configuration, while the as-installed configuration was ninety-degrees." Doc. #239 at 11, 12, 13.

The City replies that "Schrauth's calculated bearing life differs significantly from the bearing life Dodge, the bearing manufacturer, provides for the bearings in its gearboxes;" "he did not check the rated loads published by the manufacturer of the gearbox at issue here to make sure his general observation [that the rated load for the same sized bearings from different manufacturers is similar] applies here;" and Evoqua "does not cite anything to show that Dodge's calculations included any incorrect assumptions or were done after-the-fact." Doc. #247 at 9, 10.

**1. Side loading**

For the reasons explained above, Schrauth's opinion that side loading did not occur will not be excluded.

**2. C10 life**

In response to Ford's opinion that "[c]onsidering deflection and moment of the shear forces, the effects upon the output bearing will be substantial causing a deflection in the output shaft, causing the wobble described by Mr. Ware and the J&P installers," Schrauth states in his report:

> The shaft reaction force applied by the gearbox in the as-installed condition is not severe enough to cause damage to the shaft. The output hub of the gearbox is supported by a pair of 36690/36620 tapered roller bearings. The output hub bearings are an industry standard size so their load ratings can be found in the catalogs of many bearing manufacturers. Several bearing manufacturers also provide online calculators to calculate the catalog life for bearings under user-defined loads. Assuming that the 6,600-lbf shaft reaction load is applied to a single 36690/36620 rotating at 57 RPM, the Timken bearing life calculator predicts a catalog C10 life of 163,000 hours or 18.6 years of continuous use. The shaft reaction force is not large enough to damage the gearbox or to significantly reduce the life of the output hub bearings.

Doc. #230-2 at 19 (footnotes omitted). Schrauth testified that the bearing used here is "a standard

size tapered roller bearing;" and he determined the Timken calculator was appropriate to use here because between manufacturers, there is not a lot of "variation in the … dynamic life-rated load for the same size bearing." Doc. #230-6 at PageID 3296. He also testified that he does not believe the Timken calculator has the ability to input a service factor. *Id*. at PageID 3297. The Dodge whitepaper provides the C10 life for Dodge bearings at different service factors. Doc. #230-9.

It is not clear to the Court that it was inappropriate for Schrauth to calculate the C10 life using the Timken calculator instead of the Dodge whitepaper, particularly since Schrauth calculated the C10 life at a particular shaft reaction load and it is unclear whether the Dodge whitepaper accounts for shaft reaction load. At this point, the City "ha[s] not shown that [Schrauth] employed a baseless, unreliable or unaccepted methodology," *Jackson v. Parker-Hannifin Corp.*, 645 F. Supp. 3d 577, 595 (S.D. Miss. 2022), by using the Timken calculator. The City's objection to Schrauth's choice of the Timken calculator is more appropriate for cross-examination. Accordingly, Schrauth's rebuttal to Ford's testimony will not be excluded.

## VI
## Conclusion

Based on the decisions above:

1. The City's motion to exclude Paulsen's testimony [224] is **GRANTED in Part and DENIED in Part**. The motion is GRANTED to the extent Paulsen's Supplemental Opinion 3 and Supplemental Opinion 5 are excluded; and her Opinion 2, Rebuttal Opinion 5, Rebuttal Opinion 7, and Supplemental Opinion 4 are limited as described above. The motion is DENIED in all other respects.

2. The City's motion to exclude Schrauth's testimony [230] is **DENIED**.

**SO ORDERED**, this 30th day of September, 2026.

**/s/Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**