**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

**THE CITY OF STARKVILLE, MISSISSIPPI** — **PLAINTIFF**

**V.** — **NO. 1:24-CV-15-DMB-DAS**

**J & P CONSTRUCTION CO., INC.; EVOQUA WATER TECHNOLOGIES LLC; VOLKERT, INC.; and ENVIRONMENTAL TECHNICAL SALES, INC.** — **DEFENDANTS**

# MEMORANDUM OPINION

After the disc aerators in its wastewater treatment plant's aeration system failed, the City of Starkville sued the companies involved in the aeration system's improvement project. Evoqua Water Technologies LLC, the sole remaining defendant, moved for summary judgment on the negligence and breach of express warranty claims remaining against it. Because a genuine issue of material fact exists as to the elements of both claims, summary judgment was denied.

## I
## Relevant Procedural History

On December 22, 2023, the City of Starkville, Mississippi, filed a complaint in the Circuit Court of Oktibbeha County, Mississippi, against J & P Construction Co., Inc.; Evoqua Water Technologies LLC; Volkert, Inc.; and Environmental Technical Sales, Inc., regarding a project designed by Volkert and constructed by J & P using disc aerators supplied by Evoqua to address the aeration of wastewater in the City's oxidation ditches at the Ernest E. Jones Wastewater Treatment Plant. Doc. #5. Evoqua removed the case to the United States District Court for the Northern District of Mississippi on January 24, 2024, which the other defendants joined. Docs. #1, #2, #3, #4. The City's governing second amended complaint filed on November 8, 2024,

contains seven counts: (1) breach of contract by Volkert and J & P (Count One); (2) negligence by J & P (Count Two); (3) negligence by Volkert (Count Three); (4) negligence by Evoqua (Count Four); (5) breach of express warranty by Evoqua (Count Five); (6) breach of implied warranty of merchantability by Evoqua (Count Six); and (7) breach of implied warranty of fitness for a particular purpose by Evoqua (Count Seven). Doc. #98 at 6–11. Environmental Technical Sales was terminated as a party on June 9, 2025, Doc. #172; and J & P and Volkert were dismissed pursuant to a stipulation of dismissal filed March 16, 2026, Doc. #249, leaving Evoqua as the sole remaining defendant.

On June 2, 2025, the Court granted Evoqua's motion to dismiss as to the City's implied warranty claims.[1] Doc. #167. Evoqua answered the second amendment complaint on June 16, 2025. Doc. #176.

On December 12, 2025, pursuant to Federal Rule of Civil Procedure 56, Evoqua filed a motion for summary judgment as to the negligence and breach of express warranty claims remaining against it. Doc. #226. The City responded in opposition on January 9, 2026.[2] Doc. #240.[3] Evoqua replied on January 16, 2026. Doc. #244. On September 30, the Court denied Evoqua's summary judgment motion. Doc. #292. This opinion details the reasons for that ruling.

## II
## Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is

---

[1] At that time, this case was assigned to United States Senior District Judge Sharion Aycock, as it had been since it was removed from state court.

[2] The Court granted the City's request for an extension to respond. Doc. #235 (text only order).

[3] On January 14, 2026, Judge Aycock recused from this case and the case was reassigned to the undersigned district judge. Doc. #242.

entitled to judgment as a matter of law." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002) (citing FED. R. CIV. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "A disputed fact is material if it 'might affect the outcome of the suit under the governing law.'" *Allen v. U.S. Postal Serv.*, 63 F.4th 292, 300 (5th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019) (internal quotation mark omitted) (quoting *Sandstad*, 309 F.3d at 896).

In reviewing summary judgment evidence, a court "must draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations and weighing of the evidence." *Id*. "A party opposing … a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). Rule 56 "mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celetox*, 477 U.S. at 322.

## III
## Relevant Factual Background

Wastewater collected in the City of Starkville, Mississippi, is conveyed to the Ernest E. Jones Wastewater Treatment Plant, which is operated by Starkville Utilities, a department of the City. Doc. #226-24 at 1. The facility includes two oxidation ditches where oxygen is imparted to the wastewater. *Id.*

On April 4, 2019, the City tasked Volkert, Inc., with designing a project to improve the plant by replacing the existing brush rotor assemblies in the two oxidation ditches. *Id*. Volkert recommended that the City replace its brush rotors with new disc rotors. Doc. #226-32 at 2. In

completing the design plans and specifications, Volkert solicited specifications and preliminary drawings from Evoqua Water Technologies LLC, a disc aerator manufacturer, to use in its documents. Doc. #240-1 at PageID 3584; Doc. #240-2; Doc. #240-13 at PageID 3717.

After J & P Construction Co., Inc., was awarded the contract to construct the new aeration system, J & P entered into a contract ("Purchase Order") with Evoqua whereby Evoqua would furnish shop drawing submittals, supply six disc aerator assemblies for installation in the two oxidation ditches, and send a factory field service technician to the facility to check the installed equipment and instruct the City's personnel. Doc. #226-16; Doc. #240-14 at PageID 3773. An Evoqua representative was on site when the disc aerators were installed in July 2020 to ensure they were installed correctly. Doc. #240-14 at PageID 3779.

Beginning in August 2020, components of the disc aerator assemblies failed several times, and Evoqua supplied equipment and otherwise worked to repair the aerators. Doc. #240-14 at PageID 3816; Doc. #240-3; Doc. #226-18; Doc. #226-19. In 2021, Evoqua provided an extended equipment warranty of twelve months from the official startup date of January 6, 2021; and an extended bearing and gearbox warranty of twenty four months from the official startup date. Docs. #240-4, #240-5.

In January 2022, Evoqua performed a root cause analysis for the failures of the disc aerator assemblies, concluding that the build up of material on one half of the discs altered the weight of the discs, which caused the gearboxes in the disc aerator assemblies to fail. Docs. #226-19; #226-30. Evoqua determined that it could no longer honor its warranty on the equipment but would still repair or replace five of the six gearboxes. Docs. #226-18; #226-19; #226-30.

On February 15, 2023, Evoqua denied the City's claim for warranty coverage for several gearbox failures, concluding that the City failed to properly clean and maintain the discs. Doc.

#226-19. The City purchased and/or rented temporary floating aerators to use in the oxidation ditches until a new aeration system could be implemented. Doc. #228-2 at PageID 3165.

On June 20, 2023, the City tasked Garver, LLC, with designing a replacement aeration system. Doc. #226-33. Garver's proposed design involves replacing the disc aerators with brush aerators and making structural improvements to support the new system. Doc. #228-2 at PageID 3177. The total project cost for the new system is $8,900,415.00, including $4,861,000 for construction and installation of the brush rotor system; $663,781.98 for Garver's design and bidding services; and $406,600.00 for Garver's construction administration services. *Id.*; Doc. #226-31.

## IV
## Analysis

In requesting summary judgment on the City's negligence and breach of express warranty claims, Evoqua submitted that "[the City] has failed to establish the essential elements of its claims, including causation for its alleged damages;" "[b]ecause [the City]'s damages—i.e., the cost of higher-capacity equipment with feature enhancements—indisputably tie to a need to expand for future increased capacities instead of an equipment defect, [the City] cannot prove causation for either of its claims;" and "[the City]'s alleged damages are further not recoverable under Mississippi Law or the terms of the Contract on which [the City]'s claims are based." Doc. #226 at 1–2.

The City responded that "[a] genuine dispute exists as to the amount of damages [it] may recover such that summary judgment is improper;" "[s]ufficient evidence exists to show that Evoqua's negligence caused [its] damages;" and "[its] damages are recoverable under Mississippi law and under the terms of [the] Evoqua Purchase Order, if applicable." Doc. #241 at 7, 8, 12.

Evoqua replied that "[the City] cannot prove causation because its purported damages … bear no relationship at all to its claimed injury;" and "separately, [the City]'s measure of damages … is impermissible under the J&P-Evoqua Purchase Order and the law." Doc. #244 at 1, 2.

The elements of negligence are duty, breach, causation, and damages. *Strickland ex rel. Strickland v. Rankin Cnty. Sch. Dist.*, 341 So. 3d 941, 945 (Miss. 2022).[4] Causation "consists of two elements: factual cause and legal cause." *Funches v. Progressive Tractor & Implement Co.*, 905 F.3d 846, 851 (5th Cir. 2018) (citing ENCYCLOPEDIA OF MISSISSIPPI LAW § 52:19 (2d ed. 2017)). "Factual cause … depends on whether the plaintiff's injury would have occurred but for the defendant's negligence." *Id*. (citing *Glenn v. Peoples*, 185 So. 3d 981, 986 (Miss. 2015)). "The question of legal cause centers around whether 'the damage is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act.'" *Id*. (quoting *Glenn*, 185 So. 3d at 986).

Evoqua did not argue that the City did not put forward enough evidence to create a genuine issue of material fact as to duty and breach as to the negligence claim; its arguments were confined to causation and damages.

The same is true as to the City's breach of express warranty claim against Evoqua. For the breach of express warranty claim, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Seahorn Investments, L.L.C. v. Goodman Mfg. Co.*, 667 F. App'x 452 (5th Cir. 2016) (alteration in original) (quoting MISS. CODE ANN. § 75–2–313). "A warrantor breaches an express warranty when it fails to fulfill its

[4] In this diversity action, the Court applied the law of the forum state. *84 Lumber Co. v. Cont'l Cas. Co.*, 914 F.3d 329, 333 (5th Cir. 2019). The parties cited Mississippi law in their briefs. *See generally* Docs. #227, #241, #244.

obligations under the warranty." *Id*. (citing *Massey–Ferguson, Inc. v. Evans*, 406 So. 2d 15, 19 (Miss. 1981). "When dealing with an express warranty, it is the burden of the plaintiff to prove that the defect in the product or service caused the damage." *Mitchell v. Rapid Oil Change, Inc*., 752 So. 2d 466, 470 (Miss. Ct. App. 1999) (citing *Crocker v. Sears, Roebuck & Co*., 346 So. 2d 921, 923 (Miss. 1977)). The only aspects of the City's breach of express warranty claim Evoqua challenged on summary judgment were causation and damages.

**A. Causation**

Evoqua argued that "there is no causal link between [the City]'s damages of higher-capacity equipment and alleged defects in [its] equipment" because "[w]hen [the City's expert Wes] Cardwell told [the City] that it needed to purchase a larger system to keep up with increasing wastewater flows, he did not know what caused the disc aerators to purportedly fail;" "knowing that it needed a larger aeration system, but not knowing what caused [its] system to purportedly fail, [the City] filed its Complaint to recover costs that would fund its expansion rather than recovering damages tied to any alleged defect with [its] equipment;" and "both of [the City]'s testifying experts identified and recommended repairs to the disc aerators, and each repair would have been cheaper than [the City]'s upgrades and improvements[, b]ut [the City] never even attempted them." Doc. #227 at 7, 8, 10.

The City responded that "[t]he fact that the Evoqua disc aerators failed prematurely is not disputed;" "[a]lthough the cause of the failures is contested, sufficient evidence exists that the failures occurred due to Evoqua's own negligence in designing the equipment" because "Evoqua chose the mounting configuration that, according to [its expert] Dr. [George] Ford, caused the aerator failures;" "[it] paid for the Evoqua disc aerators and their installation" and "suffered damages when it was forced to pay for aeration equipment to continue treating wastewater and had

to undertake a new construction project to receive a functioning system;" and "[it] would not have incurred any of these costs if the Evoqua disc aerators worked as promised, and all of these costs are reasonably foreseeable as a result of Evoqua's negligence." Doc. #241 at 9–11.

Evoqua replied that "[the City] identified its injury and the cause of its injury: overloaded gearboxes, caused by an improper mounting configuration chosen by [it], prevented [its] disc aerator system from functioning properly;"[5] and "[the City] also identified how to fix the overloaded gearboxes: reorient the gearboxes from a vertical configuration to a horizontal configuration, at a total cost of roughly $120,000;" but instead of "attempt[ing] to reorient the gearboxes' configuration [the City] opted for a much larger, far more expensive total overhaul aimed at accommodating projected flows twenty years from now rather than specifically fixing the gearbox overloading issue." Doc. #244 at 3, 4.

The City alleges in its second amended complaint that the failure of the disc aerator assemblies resulted in damages to it, including "thousands of dollars in additional operating costs, including labor, parts, and equipment related to purchasing and renting temporary aerator equipment;" "notices of violations from the Mississippi Department of Environmental Quality;" damage to "some of the concrete near the Disc Aerator Assemblies;" and future damages including "a complete replacement of the Disc Aerator Assemblies that were installed during the Project." Doc. #98 at 5–6. The City's second supplemental response to interrogatories clarifies that it seeks "$2,911,934.39 in reasonable costs of construction necessary to replace the aeration units installed during the subject project with a properly functioning system and $352,687.52 in reasonable and necessary engineering fees for design, bid, and construction administration services related to that

[5] Evoqua disputes the City's identified cause and has retained expert witnesses who concluded that the gearboxes did not fail due to their mounting orientation, *see* Doc. #230-2 at PageID 3203–04, but failed because the City did not properly clean and maintain the discs, *see* Doc. #224-3 at 4–5.

construction," as well as "$528,336.90 in costs associated with purchasing, renting, and servicing temporary replacement equipment." Doc. #226-3 at 15.

Ford's report concludes that "[t]he cause of the failure of the Evoqua system is the motor/gearbox combination which weighs nearly one ton and exerts a shear pressure on the gearbox output shaft, bearings and lubricant seals;" "the total output shaft reaction … is 6714 pounds" with the vertical orientation but "[f]or horizontally oriented combinations, this force … can be as low as 62 pounds;" and in designing the system, Evoqua "did not consider the orientation of the motor and drive in conjunction with the constraints of the project such as adapting the aerators to the existing basins, potential disk fouling, lack of speed control (no VFDs), limited electrical service and basin depths/water levels." Doc. #236-2 at 4–5. Essentially, Ford concludes that the vertical configuration of the motor/gearbox combination caused the disc aerator assemblies to fail. *Id*.

Ford testified during his deposition that he thought changing the positioning of the gearbox and motors from vertical to horizontal would allow the disc aerators to work. Doc. #226-10 at PageID 2640–41. He also testified that certain modifications would need to be made to the surrounding cement structure to allow for a horizontal configuration—specifically, "the motor could be mounted on a pad, and belts and pulleys would be an even better configuration, but there would have to be expansion of the stand for the motor to have enough space to drive the gearbox." *Id*. at PageID 2642–43.

Regarding the decision to replace the disc rotor system with a brush rotor system, Cardwell's technical memorandum concludes:[6]

> Following evaluation of multiple aeration alternatives, a brush rotor system was recommended as the most suitable aeration technology. … This technology was

---

[6] The Court denied Evoqua's motion to strike Cardwell's opinion as to this portion of his opinion. Doc. #290.

> recommended in lieu of attempting to rehabilitate the existing system due to the numerous unsuccessful prior attempts to implement upgrades/modifications to the disc rotor system to address the recurring failures, the lack of consensus as to the cause of failure and therefore ability to correct this factor(s), the unknown condition of the existing equipment and associated total cost that rehabilitation would require, and the reduced aeration capacity unless replacement of the effluent weirs. Additionally, without drawings indicating the structural characteristics of the existing structure, the ability of the structure to adequately provide support for the equipment could not be confirmed.
>
> The proposed brush rotor system was designed to provide an aeration capacity similar to that of previous systems and when the oxidation ditches were originally placed into service. … No consideration was made for additional aeration capacity to meet future capacity needs. To meet the projected wastewater volumes identified as part of the facilities plan, future improvements will consist of a flow equalization basin and, ultimately, construction of a third oxidation.

Doc. #228-2 at PageID 13–14.

Cardwell confirmed during his deposition that he "determined that even if the disc aerators were working exactly as they were supposed to, … they would not be able to treat the projected flows expected in 2044." Doc. #226-5 at PageID 2279. He testified that he specified "a new brush rotor system with more capacity than the Evoqua disc aerators." *Id*. at PageID 2282. He also testified that potential repairs to the disc aerator assemblies were not attempted before the decision was made "to replace the existing disc aerators with a new rotor system." *Id*. at PageID 2285.

Based on Ford's testimony, there is sufficient evidence for the jury to find that the installation of the motor/gearbox combination in a vertical configuration caused the disc aerator assemblies to fail. The City also put forth evidence that as a result of the failure of the disc aerator assemblies, the aeration system did not work, and it had to purchase temporary floating aerator equipment and ultimately replace its nonfunctioning aerator system with one that did work. A reasonable jury could certainly conclude that but for Evoqua's design of the disc aerators, the disc aerator assemblies would not have failed, and the City would not have needed to use temporary aerator equipment and replace the aerator system. And a reasonable jury could also conclude that

it was foreseeable to Evoqua, who supplied the disc aerators knowing they would be used at the plant and assisted in installing and troubleshooting the disc aerator assemblies, that if the disc aerator assemblies did not function properly, it could impede the functioning of the aeration system as a whole; and that if the aeration system was not functioning, the City may need to replace the non-functioning equipment with new equipment (both temporary and permanent). *See Jab Energy Solutions II, L.L.C. v. Servicio Marina Superior, L.L.C.*, 640 F. App'x 373, 378 (5th Cir. 2016) (replacement damages "stem from the direct, immediate and foreseeable consequence" of product not functioning correctly).

Although Cardwell testified at his deposition that even if the disc aerators were working properly they would not be able to treat future projected flows, he specified in his report that in designing the new project, no consideration was made for additional aeration capacity to meet future capacity needs, and more improvements will be needed beyond the new project to meet those future needs. Cardwell's opinion provides enough evidence for a reasonable jury to conclude that the City's need to replace the disc aerator system was caused not by the need to treat future projected flows but by the failure of the disc aerators.

**B. Contract Limitations**

Evoqua argued that "[the City]'s damages conflict with the express provisions of the contract on which its express warranty claim depends" because "Article 7 of [its] Standard Terms of Sale … expressly limit [the City]'s recovery to a repair or replacement of the quote 'subject parts'" and "[the City] indisputably claims more than the repair or replacement of the gearboxes;" "the same provision excludes from [its] liability 'all costs of installation of repaired or replaced work[,]' … the costs of several pieces of equipment, structure modifications, labor to gain access to the equipment, and installation costs, all of which are indisputably part of [the City]'s damages;"

and "[its] warranty is expressly subject to a limit of liability for both negligence and breach of warranty, which excludes 'ANY CONSEQUENTIAL, INCIDENTAL, [OR] SPECIAL DAMAGES' and limits … total liability to the 'PURCHASE PRICE PAID FOR THE WORK.'" Doc. #227 at 13, 14.

The City responded that "[t]he limited remedy provision in the Purchase Order, by its own terms, does not affect the remedies available to [it] on its negligence and breach of warranty claims" because "Evoqua limited the remedies available to J&P for Evoqua's breach of warranty" but since "[it] is not mentioned in the limited remedy provision, [its] remedies are not affected;" "[t]he purported allocation to J & P of responsibility for costs of installation for repair or replaced work does not limit [its] recoverable damages;" "even if [the damages limitation provision] did extend to [it], [its] damages are not limited by the exclusive remedy because the warranty failed of its essential purpose;" and "[r]egardless of whether the limitations described in the Purchase Order may apply to [it], those limitations do not govern [its] negligence claim against Evoqua to the extent that [its] damages were caused by Evoqua's breach of extra-contractual duties." Doc. #241 at 12, 14, 17.

Evoqua replied that "[the City] disingenuously seeks to claim the benefit of the Evoqua-J&P Purchase Order while avoiding its limitations;" "[the City's] negligence claim is … subject to the Purchase Order's limitations on liability" because "[its] supposed 'extra-contractual duties' … were expressly included in the Evoqua-J&P Purchase Order;" and "it is undisputed that [its] warranty worked exactly as it was supposed to." Doc. #244 at 6, 7.

**1. Applicability of limitations**

The Purchase Order between Evoqua and J & P, on which the City's breach of express warranty claim is based, specifies that Evoqua is the seller and J & P is the buyer; and Evoqua's

standard terms of sale apply to and govern the sale. Doc. #226-16 at PageID 2855–57. The standard terms of sale contain the following provisions:

> **7. Warranty**. … Seller warrants to Buyer that the (i) Work shall materially conform to the description in Seller's Documentation and shall be free from defects in material and workmanship and (ii) the Services shall be performed in a timely and workmanlike manner. … If Buyer gives Seller prompt written notice of breach of this warranty within the Warranty Period, Seller shall, as its sole option and as Buyer's sole and exclusive remedy, repair or replace the subject parts, re-perform the Service or refund the purchase price. Unless otherwise agreed to in writing by Seller, (i) Buyer shall be responsible for any labor required to gain access to the Work so that Seller can assess the available remedies and (ii) Buyer shall be responsible for all costs of installation of repaired or replaced Work. … THE WARRANTIES SET FORTH IN THIS SECTION 7 ARE THE SELLER'S SOLE AND EXCLUSIVE WARRANTIES AND ARE SUBJECT TO THE LIMITATION OF LIABILITY PROVISION BELOW. SELLER MAKES NO OTHER WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE.
>
> …
>
> **13. Limitation of Liability**. NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY, SELLER SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE OR OTHER INDIRECT DAMAGES, AND SELLER'S TOTAL LIABILITY ARISING AT ANY TIME FROM THE SALE OR USE OF THE WORK, INCLUDING WITHOUT LIMITATION ANY LIABILITY FOR ALL WARRANTY CLAIMS OR FOR ANY BREACH OR FAILURE TO PERFORM ANY OBLIGATION UNDER THE CONTRACT, SHALL NOT EXCEED THE PURCHASE PRICE PAID FOR THE WORK. THESE LIMITATIONS APPLY WHETHER THE LIABILITY IS BASED ON CONTRACT, TORT, STRICT LIABILITY OR ANY OTHER THEORY.

*Id*. at PageID 2869, 2870. The Purchase Order also specifies that "[u]pon acceptance of this purchase order, the Seller is bound to the Contractor by the terms of the Drawings, Specifications, and the jobsite conditions, as they apply to the material / services acquired under this purchase order." *Id*. at PageID 2857. Specifications Section 0800 requires a written "guaranty/warranty from the manufacturer of all major pieces of equipment" installed on the Project for the benefit of the City as "Owner." Doc. #240-16 at 7.

The City pointed to a provision in Specifications Section 01740 which specifies that "[m]anufacturers['] disclaimers and limitations on product warranties do not relieve the Contractor of the warranty on the Work that incorporates the products, nor does it relieve suppliers, manufacturers and subcontractors required to countersign special warranties with the Contractor." Doc. #240-17 at PageID 3946. However, the City did not explain how Evoqua falls under this provision. It does not appear from the record that Evoqua was a manufacturer required to countersign a special warranty with J & P, since the only warranty in the Purchase Order is the warranty in Evoqua's standard terms of sale. *See id*. ("Standard Product Warranties are preprinted written warranties published by individual manufacturers of particular products and are specifically endorsed by the manufacturer to the Owner," while "Special Warranties are written warranties required by or incorporated in the Contract Documents either to extend time limits provided by standard warranties or to provide greater rights for the Owner").

Although the terms of sale use the terms "Buyer" and "Seller" and the City is not the buyer here, the Specifications explicitly state that the warranty is for the benefit of the City. This makes the City a third-party beneficiary subject to the terms of the Purchase Order, including its limitations on liability.[7] *See Hercules, Inc. v. Stevens Shipping Co*., 629 F.2d 418, 422 (5th Cir. 1980) ("As a third-party beneficiary, Escambia's rights spring from the contract. … Of course, any defenses that could have been raised against a claim by a party to the contract would be good as against a third-party beneficiary.") (citation omitted).

---

[7] Holding that Article 7's limitation on damages did not apply to the City's claims would also conflict with this Court's earlier decision dismissing the City's breach of implied warranty claims as barred by Article 7's disclaimer. Doc. #167. It would be inconsistent to conclude that Article 7's disclaimer relieves Evoqua of liability for breach of implied warranty but that the limitation in the same section does not relieve Evoqua of damages beyond the limitations in the warranty.

**2. Failure of essential purpose**

The Mississippi Uniform Commercial Code ("U.C.C.") provides that a contract "may provide for remedies in addition to or in substitution for those provided in [the U.C.C.] and may limit or alter the measure of damages recoverable under [the U.C.C.], as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and [r]esort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." MISS. CODE ANN. § 75-2-719 (1)(a)–(b) (2025). But "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in [the U.C.C]." MISS. CODE ANN. § 75-2-719 (2). "The test in determining whether a limited warranty failed of its essential purpose is whether the buyer is given, within a reasonable time, goods that conform to the contract." *Steel Dynamics Columbus, LLC v. Altech Env't USA Corp.*, 273 F. Supp. 3d 627, 645 (N.D. Miss. 2017) (quoting *Delhomme Indus. v. Hou. Beechcraft, Inc.*, 669 F.2d 1049, 1063 (5th Cir. 1982)), *aff'd*, 734 F. App'x 234 (5th Cir. 2018). "The purpose of a repair-or-replace contracted remedy is to give the buyer what he bargained for …. This purpose is defeated if the goods are destroyed by their own flaws so that repair or replacement are totally unsatisfactory." *Id*. at 645–46 (quoting *Mercury Marine v. Clear River Const. Co.*, 839 So. 2d 508, 513 (Miss. 2003)).

Whether the limited express warranty failed of its essential purpose is an issue of fact for the jury. *See, e.g., Becker v. Continental Motors, Inc.*, No. 4:13-CV-520, 2015 WL 1333235, at *5 (N.D. Tex. Mar. 24, 2015) (applying identical provision in Texas U.C.C.); *Woolums v. National RV*, 530 F. Supp. 2d 691, 701 (M.D. Pa. 2008) (applying identical provision in Pennsylvania U.C.C.). The City has put forth evidence that the disc aerator assemblies repeatedly failed over a period of several years despite Evoqua's remedial efforts. This is sufficient evidence from which

a reasonable jury could find that the warranty failed of its essential purpose and, therefore, that the City is not limited to the remedies specified in the warranty. *See Steel Dynamics*, 273 F. Supp. 3d at 645–46 ("exclusive repair-and/or-replace warranty failed of its essential purpose" when "[d]espite over three years of remedial efforts by Altech, the critical malfunctions of the CEMS were never corrected, and the CEMS remained unsuitable and insufficient for their specified purpose"). Though Evoqua argued that "[u]nlike … the computer in *Steel Dynamics*, the disc aerator system was not inherently faulty," Doc. #244 at 8, as explained in the discussion of causation above, the City has provided evidence that the disc aerator system was inherently faulty due to the design of the disc aerators, specifically, the choice of a vertical configuration of the gearbox/motor, and that this fault caused the disc aerator assemblies to fail.

Because there is a genuine issue of material fact as to failure of essential purpose, there is also a genuine issue of material fact as to whether the limitation of liability in Article 13 limits the City's damages. *See Steel Dynamics*, 273 F. Supp. 3d at 646 ("to the extent that the exclusive repair-and/or-replace warranty failed of its essential purpose, the separate consequential and incidental damages limitation also fails under § 75–2–719(2) with respect to damages resulting from the breach of warranty" because "damages limitation 'presuppose[d] … that the warrantor would fulfill his warranty' as much as the limited warranty did") (alterations in original). So, the Court cannot conclude at this point that the City's damages are limited by Article 7 or Article 13.

**3. Negligence claim**

The City argued that because "Evoqua assisted Volkert for several months before it entered into the Purchase Order with J & P" by "provid[ing] sample specifications that were incorporated into the Project contract documents and provided preliminary design drawings to Volkert,"

"[t]hose services were not performed under the Purchase Order, and therefore, the terms of the Purchase Order do not govern [its negligence] claim related to those services." Doc. #241 at 18.

Evoqua pointed to a provision in the Purchase Order stating that "[a]ppropriate shop drawings and/or data sheets, are to be submitted to the contractor by the seller." Doc. #226-16 at PageID 2855. The Purchase Order also specifies that "Evoqua will furnish shop drawing submittals … [w]ithin 8 to 10 weeks from the date of final agreement by both parties." Doc. #226-16 at PageID 2860. Reading these provisions together, the Purchase Order refers to shop drawings to be submitted to J & P after the parties agree to the Purchase Order, which are not necessarily the same as the "preliminary design drawings" and "sample specifications" provided to Volkert before entering into the Purchase Order. To the extent the City's negligence claim is based on such preliminary drawings and specifications, its damages would not be limited by Article 13, even if Article 13 applies.

**C. Mississippi Law**

Evoqua argued that "[b]oth causes of action, which stem from alleged construction defects, authorize plaintiffs to recover the cost of repair;" and the City "has failed to prove (i) that the disc aerators are worthless; (ii) that repairing the disc aerators results in economic waste; or (iii) that replacing the disc aerators is its only option." Doc. #227 at 15, 16.

The City responded that as to its negligence claim, "a reasonable jury could rely on existing evidence and find that Evoqua's negligence in providing engineering design services for the Project proximately caused the damages [it] seeks;" and as to its breach of express warranty claim, "[t]he damages available to [it] largely depend on whether [it] accepted, rejected, or revoked acceptance of the Evoqua disc aerators," and since "Evoqua gave an extended warranty on the equipment later in 2021 and proposed new terms of final acceptance in January 2022 after all six

aerators were functioning properly for 30 days, which never occurred," "the question of whether the disc aerators were accepted is more appropriately answered by a jury." Doc. #241 at 19, 21, 22.

Evoqua replied that as to negligence, "[the City] identified the negligent act as improperly choosing a vertical configuration for the gearbox and damages should therefore be limited to replacement/repair of the gearbox itself" because "[i]t was never foreseeable that [it] would need to upgrade [the City's] equipment to accommodate increasing wastewater flows;" and as to breach of express warranty, the City "fail[ed] to prove it revoked acceptance," and "[e]ven assuming [the City] did revoke acceptance, it would be entitled only to the purchase price of [its] equipment." Doc. #244 at 9.

**1. Negligence**

Though Evoqua argued that the City's damages on both claims are limited to the cost of repair, its argument focused on the breach of warranty claim and it cited no authority requiring damages for negligence to be limited to the cost of repair. As discussed in the causation section above, there is enough evidence here for a reasonable jury to find that the failure of the disc aerator assemblies was both the factual and legal cause of the City's damages.

**2. Breach of express warranty**

"The general measure of damages for breach of warranty is 'the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted.'" *Steel Dynamics*, 734 F. App'x at 236 (quoting MISS. CODE ANN. § 75-2-714(2)).

The Mississippi U.C.C. provides that "[w]here the buyer has accepted goods[,] … he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of

events from the seller's breach as determined in any manner which is reasonable." MISS. CODE ANN. § 75-2-714(1). "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *Id.* at § 75-2-714(2). "In a proper case any incidental and consequential damages under Section 75-2-715 may also be recovered." *Id.* at § 75-2-714(3). "Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." *Id.* at § 75-2-715(1). Consequential damages include "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." *Id.* at § 75-2-715(2)(a).

Contrary to Evoqua's argument, the cost of repairs is not the only possible measure of damages for breach of warranty when the buyer has accepted goods. "Applying § 75-2-714(2), the Mississippi Supreme Court has held that 'if the [product] could have been repaired so as to properly function, the measure of damages under § 75–2–714 [is] the cost of repairs,' not to exceed the purchase price, and 'if the [product] could not be repaired and was worthless, the [buyer] under § 75–2–714 would [be] entitled to a refund of the purchase price.'" *Powell v. Worldwide Trucks, LLC*, No. 3:23-CV-2985, 2025 WL 240941, at *7 (S.D. Miss. Jan. 17, 2025) (alterations in original) (quoting *Fedders Corp. v. Boatright*, 493 So. 2d 301, 309 (Miss. 1986)); *see* 1 JAMES J. WHITE, ROBERT S. SUMMERS & ROBERT A. HILLMAN, UNIFORM COMMERCIAL CODE § 11:3 (6th

ed. 2026) ("A common objective measurement of the difference in value as is and as warranted is the cost of repair or replacement.") (citations omitted).

Though the cost of repairs is the typical measure of damages if the product could have been repaired, the City has put forth some evidence that the disc aerators could not be repaired so as to properly function, specifically Cardwell's testimony regarding prior unsuccessful attempts to modify the disc rotor system and lack of consensus as to the cause of failure. And if "an exclusive limited contractual remedy fails of its essential purpose, a subsequent action is a 'proper case' for recovery of incidental and consequential damages." *Steel Dynamics*, 273 F. Supp. 3d at 647 (citing *Mercury Marine v. Clear River Const. Co*., 839 So. 2d 508, 528 (Miss. 2003)).

As Evoqua observed, the City discussed the remedies for breach of express warranty when goods are rejected or revoked but did not represent that it ever rejected or revoked acceptance of the disc aerators. The Court need not determine at this point whether the goods were accepted or rejected, or whether acceptance was revoked, because in any case, the Court does not conclude that the City's damages are limited to the cost of repair.[8]

**3. Summary**

At this stage, the Court did not limit any damages of the City to the cost of repair on its negligence claim or its breach of express warranty claim.

**D. Unlawful Betterment**

Evoqua argued that "[n]otwithstanding the legal and contractual limits on [the City]'s damages, [the City] indisputably seeks an unlawful benefit or betterment" because "recovering the

---

[8] The Mississippi U.C.C. provides that when a buyer rightfully rejects or justifiably revokes acceptance, "the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid … 'cover' and have damages under Section 75-2-712." MISS. CODE ANN. § 75-2-711. The buyer may cover by purchasing goods in substitution for those due from the seller in good faith and without unreasonable delay, and may recover the difference between the cost of cover and the contract price along with incidental and/or consequential damages. *Id*. at § 75-2-712 (1), (2).

cost of upgraded equipment, plus items expressly excluded from [its] original scope, would amount to an unjust windfall." Doc. #227 at 17.

The City responded that "there is at least a genuine dispute as to whether recovering the cost of the brush rotor aerator system amounts to a windfall" because "[i]ncreased aeration capacity compared to the disc aerators does not constitute double recovery" considering Evoqua's representations that "disc aerators offer a number of benefits compared to brush rotors." Doc. #241 at 8.

Evoqua replied that the City's replacement damages "include[] equipment and services that are undisputedly beyond the scope of [its] original contract: (i) a $1.2M brush rotor system that costs $500,000 more than [its] disc aerator system; a (ii) a plethora of add-on items (like variable frequency drives, weather hoods, and DO Controls) that [it] offered but [the City] rejected; and (iii) structural services that [the City] expressly excluded from its scope." Doc. #244 at 10.

It is true that the City should not be awarded damages that would amount to an unjust windfall, and it is possible that the City's damages may ultimately be limited to less than the full amount of its replacement costs. *See Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) ("[W]ithout adjusting the replacement cost of the new Scalfuel plant downward to account for the original plant's depreciation, FM would reap a windfall in its overall recovery[.]"); *Cooper v. Meritor, Inc.*, No. 4:16-CV-52, 2019 WL 545263, at *3 (N.D. Miss. Feb. 11, 2019) ("recovery must involve a deduction of higher value items in the proposed replacement home" in light of "Mississippi's general proscription against windfall recovery"); *Wall v. Swilley*, 562 So. 2d 1252, 1258 (Miss. 1990) ("[T]he Court must be careful to assure that the plaintiff obtains no double recovery or unjust enrichment."). However, it is premature at the summary judgment stage

to determine whether, and in what amount, any damages recovered by the City may ultimately be reduced to avoid an unjust windfall.

## V
## Conclusion

For the reasons explained above, Evoqua's motion for summary judgment [226] was denied.

**SO ORDERED**, this 6th day of October, 2026.

**/s/Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**